UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| APRIL HAYNES, ) | |
| Plaintiff, ) | |
| v. ) | No. 07 C 3125 |
| ) | |
| VILLAGE OF LANSING, A MUNICIPAL ) | Judge Rebecca R. Pallmeyer |
| CORPORATION, LANSING POLICE DEPARTMENT, ) | |
| OFFICER MICHAEL HYNEK #332, OFFICER ) | |
| KLINGELSCHMIDT #327, OFFICER YONKERS ) | |
| #303, OFFICER TATGENHORST #329, OFFICER ) | |
| HEINTZ #321, AND OFFICER HASSE #324, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff April Haynes ("Haynes") brings this action under 42 U.S.C. § 1983 against the Village of Lansing ("Village") and certain Village police officers ("Officers") in both their official and individual capacities. Specifically, Plaintiff claims that Defendant Officers used excessive force in effecting her arrest or that they failed to intervene to stop the use of excessive force by others. Defendant has moved for summary judgment on all claims, and for the reasons discussed below, that motion is granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts are drawn from Defendant's Local Rule 56.1(a) Statement of Facts and attached exhibits [Dkt. 73]. N.D. Ill. Local R. 56.1(a). Although Plaintiff filed a brief in response to Defendant's Motion for Summary Judgment, she did not respond to Defendant's Rule 56.1(a) Statement either by admitting or denying the facts asserted pursuant to Rule 56.1(b)(3)(B) or by submitting an Additional Statement of Facts pursuant to Local Rule 56.1(b)(3)(C). Failure to comply with Rule 56.1(b) may result in the court accepting as true all facts set out in the Rule 56.1(a) Statement. It does not, however, result in an automatic grant of summary judgment: Defendant still bears the burden of showing that it is entitled to summary judgment as a matter of law, and the court must evaluate all facts in the light most favorable to Plaintiff. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

**The Accident and the Investigation**

On the morning of November 23, 2005, Plaintiff's son, Lance, drove Plaintiff's car into a pole while driving himself and his younger brother, Ellis, to school. (Def. 56.1 ¶ 1, Pl. Dep. 47.) Ellis was sitting in the passenger's seat and the two were fighting when Lance crashed the car. (Def. 56.1 ¶ 1.) At the time, Lance held a learner's permit, but was not a licensed driver. (*Id.* ¶ 2.) The car, a 1992 Crown Victoria, was totaled. (*Id.* ¶ 3.) Lance called Plaintiff from a nearby restaurant called Mancino's Pizza & Grinders ("Mancino's") and told her what had happened. (*Id.* ¶ 4.) Plaintiff responded that she was on her way. (*Id.* ¶ 5.) By the time Plaintiff arrived in one of the other two cars she owned at the time, Lance and Ellis had hitched a ride to school with some classmates who happened to drive by. (Pl. Dep. 41, 47.) They left the car smashed up against the pole. (*Id.* ¶ 7.)

Shortly after Plaintiff reached the scene, Officer Michael Hynek arrived to investigate. (*Id.* ¶ 8.) It is not entirely clear from the record who notified the police of the accident, but Plaintiff testified that Lance called the police from Mancino's immediately after the crash and before calling Plaintiff. (Pl. Dep. 46:16-17, Ex. A to Def. 56.1 Statement.) When Officer Hynek first arrived at the scene, he asked Plaintiff what happened and Plaintiff claimed she did not know. (*Id.* 49:7-11, 50:6-23, 64:14-65:5.) According to Officer Hynek's deposition testimony, Plaintiff initially told him she had been driving the car. (Hynek Dep. 17:16-19, Ex. C to Def. 56.1 Statement.) Plaintiff, however, claims she told Officer Hynek that she did not know who was driving the car and did not volunteer any additional information about who may have been driving. (Pl. Dep. 61:10-24.) Officer Hynek instructed Plaintiff to wait inside Mancino's, which had not yet begun serving customers, while he continued his investigation. (*Id.* 54:8-21.) Some 20 to 25 minutes after Plaintiff reached the scene, Officer Barbara Klingelschmidt arrived to assist Officer Hynek. (Def. 56.1 ¶ 16.) Officer Hynek instructed Officer Klingelschmidt to stay with Plaintiff in Mancino's while he continued his investigation. (Def. 56.1 ¶ 15.) Over the course of an hour, Officer Hynek questioned several people who had witnessed the accident, and other unidentified officers interviewed Lance at the

school nurse's office, though it is unclear whether Officer Hynek knew of this interview before he arrested Plaintiff. (Def. 56.1 ¶ 13; Pl. Dep. 15-18.) Based on his investigation, Officer Hynek came to believe that a young boy had been driving the car with another child riding in the passenger seat. (Def. 56.1 ¶ 17.) Hynek asked Plaintiff whether she was aware that more than one person was in the car at the time of the accident, and again Plaintiff claimed she did not know. (Hynek Dep. 18:8-22; Pl. Dep. 62:1-63:3.) Based on Plaintiff's responses to his questions, Hynek concluded that Plaintiff had provided him with false information about the identity of the driver. (Hynek Dep. 18:8-22.) It is undisputed that Plaintiff was unarmed and that none of the Defendant Officers at any time believed she was armed.

**Plaintiff's Arrest**

Plaintiff's entire arrest was captured on two security cameras in Mancino's and submitted on DVD as Exhibit J to Defendant's Rule 56.1 Statement. Neither camera recorded any audio, but Plaintiff and several of the officers testified to their recollections of what was said. In the video, Plaintiff is initially sitting by herself at a table in Mancino's, which appears to be a small, family-style pizza restaurant. No one else is present in the restaurant's dining area and most of the chairs are hanging upended from the edges of the tables.[1] Officer Hynek and Officer Klingelschmidt enter the restaurant, and according to Plaintiff, Officer Hynek yelled, "[S]tand up and put your hands behind your back; Lance was driving." (Def. 56.1 ¶ 18.) Plaintiff testified that at this time she understood that she was under arrest, but did not yet know why. (Def. 56.1 ¶ 19; Pl. Dep. 59:21-60:13.)

Plaintiff stands up and Officer Hynek attempts to pull her hands behind her back to apply handcuffs. Handcuffing behind the back is intended to prevent the arrestee from using the cuffs as a weapon against the officer. (Hynek Dep. 20:11-14.) It is unclear in the video whether Plaintiff

---

[1] At least one Mancino's employee was in the back of the restaurant baking during the arrest, but she testified in her deposition that she did not witness any of the arrest and only overheard what was later confirmed to be the sound of a taser. (Siemers Dep., Ex. B to Def. 56.1 Statement.)

3

says anything, but according to her testimony, she explained to Officer Hynek that she was too large to be handcuffed behind her back and requested to be handcuffed across the front of her body. (Pl. Dep. 60:18:22.) Officer Hynek also testified that Plaintiff did at some point tell him that she was physically incapable of putting her wrists together behind her back, and according to Officer Hynek, he and Officer Klingelschmidt told Plaintiff that they intended to use multiple sets of handcuffs if necessary. (Hynek Dep. 12:4-9.) At the time of her arrest, Plaintiff weighed approximately 415 pounds. (Pl. Dep. 13:7.)

Plaintiff responds to Officer Hynek by forcefully twisting and pulling away from him. Plaintiff testified that at this time Officer Hynek told her she'd "been fucking him around all morning." (Pl. Dep. 61:2-3.) After a few seconds' struggle, Officer Hynek and Officer Klingelschmidt wrestle Plaintiff to the floor of the restaurant, where she pins her hands under her body in an attempt to prevent the officers from pulling them behind her back. Officer Hynek, obviously agitated, pulls his baton from its holster and begins swinging it at Plaintiff without actually striking her. Officer Hynek then places the baton on a table behind him and removes his taser[2] from its holster. He points the taser in Plaintiff's face and appears to be yelling at her. After a moment, Officer Hynek re-holsters his taser and kneels beside Plaintiff. He and Officer Klingelschmidt, who until this time has acted as little more than a spectator, then attempt to flip Plaintiff onto her back. Plaintiff resists, and Officer Hynek kneels on Plaintiff's right shoulder in an attempt to lever her arms out from under her. When that proves unsuccessful, he again unholsters his taser and this time applies it to Plaintiff's right shoulder, delivering a 50,000 volt shock. (Klingelschmidt Dep. 8:5-7.) After shocking Plaintiff with the taser, Officers Hynek and Klingelschmidt again attempt to pull Plaintiff's arms behind her back and again she resists. Officer Hynek seizes Plaintiff's right wrist, waves the taser in Plaintiff's face while speaking to her, and then releases her wrist. Plaintiff, now lying on her back, waives her

---

[2] A "stun gun or 'taser' is a non-lethal device commonly used to subdue individuals resisting arrest. It sends an electric pulse through the body of the victim causing immobilization, disorientation, loss of balance, and weakness." *Matta-Ballesteros v. Henman*, 896 F.2d 255, 256 n.2 (7th Cir. 1990).

4

open palms before her face in a defensive gesture. Officer Hynek attempts to seize Plaintiff again, but she bats him away. Officer Hynek then begins to circle Plaintiff, with the taser readied. Plaintiff swats at the taser several times before Officer Hynek grabs her right wrist and shocks her on the right side of her chest just above breast. After being tased a second time, Plaintiff sits up and attempts to speak to Officer Klingelschmidt, who has been circling Plaintiff and occasionally attempting to restrain her. While Plaintiff is speaking to Officer Klingelschmidt, Officer Hynek approaches Plaintiff from behind and grabs the back of her neck, forcing her head toward the ground, with Officer Klingelschmidt assisting. Officer Hynek releases Plaintiff, takes a step back, and tases for her a third time on the left side of her chest. Officers Hynek and Klingelschmidt are again attempting to seize Plaintiff's hands when a third officer arrives.

This third officer, Dada Tatgenhorst, appears to direct Officers Hynek and Klingelschmidt to step away from Plaintiff. Officers Tatgenhorst and Klingelschmidt then attempt to help lift Plaintiff to her feet, with Officer Hynek continuing to shout at Plaintiff throughout. Officer Tatgenhorst does not strike, taser, knee, kick, or otherwise physically assault Plaintiff in the video. Officer Tatgenhorst later testified that Plaintiff told him that she had a disability, but did not specify its nature. Plaintiff also told Officer Tatgenhorst that she was incapable of bringing her hands together behind her back. (Tatgenhorst Dep. 12:23-13:4.)

As Officers Tatgenhorst and Klingelschmidt are helping Plaintiff to her feet, a fourth officer, Todd Yonkers, walks into the camera's range and also tries to help lift Plaintiff, without success. At this point, Plaintiff begins speaking to the officers from a seated position on the floor, and Officer Yonkers begins talking with Officer Hynek before leaving the restaurant for the remainder of the arrest. Officer Tatgenhorst kneels beside Plaintiff, clasps her right hand, and appears to try to calm her. A conversation ensues between Officers Tatgenhorst, Klingelschmidt, and Plaintiff. During this conversation, two more officers, Todd Heintz and Christopher Hasse, enter the restaurant. Officer Hynek and Plaintiff appear to begin to argue, but Officers Heintz, Tatgenhorst, and

Klingelschmidt cut the exchange short and lift Plaintiff to her feet. Once Plaintiff is on her feet, she clasps her hands in front of her. Officer Hynek grabs Plaintiff's face, and Officer Heintz strikes her forearm with his fist to force her hands apart, a technique he testified to learning as part of his formal training in forcing an arrestee to submit to an order of arrest. (Def. 56.1 ¶ 44; Heintz Dep. 14:12-15:8, Ex. G.)

Plaintiff continues to struggle with all five officers for approximately another minute and a half, when she is finally secured in three sets of handcuffs chained together behind her back, leaving her arms hanging near her sides. (Def. 56.1 ¶¶ 47-48.)

Following her arrest, Plaintiff was transported to the Lansing police station and released after paying a $100 bond. (Def. 56.1 ¶ 49.) Plaintiff did not request medical attention at Mancino's or at the police station. (Def. 56.1 ¶ 50.) On November 24, 2005, the day after her arrest, Plaintiff visited the emergency room of Ingalls Memorial Hospital. The emergency room physician's report records the presence of abrasions and contusions due to electric shock, but does not indicate any serious injury. (Def. 56.1 ¶ 50; Emergency Room Report, Ex. I to Def. 56.1.) Plaintiff has submitted no other evidence of injury resulting from her arrest. Following a trial (the record does not indicate whether by judge or jury), Plaintiff was found guilty of resisting arrest. (Def. 56.1 ¶ 51.)

**Officer Training**

According to the testimony of Defendant Officers, the Lansing Police Department requires its officers to receive use-of-force training, including training in how to use a baton and taser in making an arrest. (Hasse 7-9; Heintz Dep. 6-8; Hynek Dep. 6-8; Klingelschmidt Dep. 6-9; Tatgenhorst Dep. 5-12; Yonkers Dep. 8-12.) All Defendant Officers testified that they received use-of-force training at least once each year, including training in the use of tasers and review of the Department's official policy on taser use. (*Id.*) The written policy is not included in the record and none of the officers testified about its substance. (*Id.*) None of the officers was aware of any side effects or injuries that can be caused by the use of a taser. (*Id.*)

Some of the officers also testified about Police Academy and Lansing Police Department training regarding the use of handcuffs and the linking of multiple sets of handcuffs for situations when an arrestee is too large to put her arms behind her back. (Heintz Dep. 11; Klingelschmidt Dep. 13-14; Tatgenhorst Dep. 12-14; Yonkers Dep. 17-18.) All the officers who testified about the existence of such a policy agreed that Plaintiff was large enough to warrant the use of multiple sets of handcuffs. (*Id.*) As with the Department's policy regarding tasers, no written policy on the use of handcuffs was produced in discovery.

## **DISCUSSION**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex v. Corp v. Catrett*, 477 U.S. 317, 322 (1986); *Vision Church of Village of Long Grove*, 468 F.3d 975, 988 (7th Cir. 2006). The court must evaluate all admissible evidence in the light most favorable to the nonmoving party. *Lee v. Young*, 533 F.3d 505, 509 (7th Cir.2008). It may not make credibility determinations or weigh evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Johnson v. Doughty*, 433 F.3d 1001, 1009-10 (7th Cir.2006) (citing *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003).)

Defendants argue that Plaintiff's claims are barred by *Heck v. Humphrey*; that the individual Defendants have qualified immunity or are entitled to judgment on the merits; and that Defendant Lansing has no *Monell* liability. The court considers these arguments in turn.

**I.  Plaintiff's Claims Are Not Barred by the *Heck* Doctrine**

Defendant argues, first, that the holding announced in *Heck v. Humphrey* bars Plaintiff's § 1983 claims. 512 U.S. 477, 486-87 (1994). Under the *Heck* doctrine, a § 1983 action must be dismissed where the plaintiff has been convicted of the underlying criminal charge and "judgment

7

in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence . . . ." *Id.* at 487. If the court determines that the success of plaintiff's action would not necessarily demonstrate the invalidity of the her criminal conviction, however, then the action may proceed. *See VanGilder v. Baker*, 435 F.3d 689, 691-92 (7th Cir. 2006) (citing *Heck*, 512 U.S. at 487). For *Heck* to apply, there must be "a clear nexus between the plaintiff's conviction and the alleged wrongful government action" such that a favorable judgment for plaintiff would create "two conflicting resolutions arising out of the same or identical transaction." *Id.* at 692 (citing *Heck*, 512 U.S. at 484.)

This case presents no such conflict. Plaintiff does not challenge the validity of her conviction, nor does she dispute that she was in fact resisting arrest at the time the officers allegedly used excessive force. *See VanGilder*, 435 F.3d at 691-92 (allowing excessive force claim to proceed where plaintiff, who was convicted of resisting a law enforcement officer, "[did] not collaterally attack his conviction, deny that he resisted [the officer's] order to comply with the blood draw, or challenge the factual basis presented at his change of plea hearing.") Allowing her claim to proceed does nothing to undermine her conviction for resisting arrest, whereas applying *Heck* under these circumstances runs the risk of "imply[ing] that once a person resists law enforcement, he has invited the police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages." *Id.*

## II. Qualified Immunity

Defendant contends that the doctrine of qualified immunity shields all Defendant Officers from liability for damages in their individual capacities. "Police officers who use force in making an arrest are entitled to qualified immunity from suits for damages under 42 U.S.C. § 1983 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To defeat a defense of qualified immunity,

Plaintiff must show that the alleged conduct violates her right under the Fourth Amendment to be free from unreasonable search or seizure. *See Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2004) ("[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.") If Plaintiff meets her burden, the court must then consider whether the conduct, viewed objectively, violated constitutional or statutory rights that were clearly established at the time. *See Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985). Plaintiff may show the existence of a clearly established constitutional right either by "(1) pointing to a closely analogous case that established a right to be free from the type of force the police officers used on him, or (2) showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Plaintiff relies on the second method, arguing that the force was plainly excessive in light of evidence "that an officer repeated (*sic*) emitted high voltage in (*sic*) the body of a woman who was, 1) unarmed, 2) non-aggressive or offensive toward the officers, and most importantly was a person known to be disabled with a heart condition." (Pl. Resp. at 8.)

The court is mindful that "[t]he police cannot have the specter of a § 1983 suit hanging over their heads when they are confronted with a dangerous fugitive, possible escapee, or as long as their behavior falls within objectively reasonable limits." *Clash*, 77 F.3d at 1048 (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). At the same time, where "the facts draw into question the objective reasonableness of the police action under the alleged circumstances," the court should deny summary judgment to allow for the further development of disputed facts concerning the propriety of the force used in relation to the apparent threat posed by the arrestee. *Id.* at 1048.

9

As the parties themselves recognize, the arrest is most easily analyzed in two separate time periods—the period at the beginning of the arrest when only Officers Hynek and Klingelschmidt were present, and the period thereafter commencing with the arrival of Officer Tatgenhorst. As seen in the video and alleged in the Complaint, Officer Hynek was the only officer to tase, kick, or strike Plaintiff on the neck and head, and Officer Klingelschmidt was the only other officer present throughout this alleged conduct. (*See* Compl. ¶¶ 13-15.) The alleged conduct of the later-arriving officers was considerably less severe, consisting primarily in attempting to force Plaintiff into a posture that would permit handcuffing. The court therefore considers first, the conduct of Officers Hynek and Klingelschmidt and Plaintiff's "excessive force" claim against these officers.

### A.   Liability of Officers Hynek and Klingelschmidt

Plaintiff alleges that Officer Hynek and Officer Klingelschmidt used excessive force in carrying out the arrest. When addressing the reasonableness of an officer's use of force, the court will consider the following factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of officers or others, and (3) whether he is actively resisting arrest by flight. *C.O. ex rel. O'Banion v. City of South Bend*, No. 3:07-CV-106 JVB, 2009 WL 2382620, at *5 (N.D. Ind. July 30, 2009) (citing *Graham*, 490 U.S. at 397 (1989)).

The court agrees with Plaintiff that there is a genuine issue of fact as to whether Officer Hynek's conduct, particularly his repeated use of a taser, was objectively reasonable or whether, in the words of the district court in *Clash*, it was "wholly gratuitous" to executing Plaintiff's arrest. *See* 77 F.3d at 1048 (declining to hold that shoving an already-handcuffed and subdued suspect into police car was reasonable as a matter of law, even though degree of harm presented appeared minor). There is similarly a question whether Officer Klingelschmidt, the only other officer present when Officer Hynek tased Plaintiff, participated in this allegedly unlawful use of force. Both Officers Hynek and Klingelschmidt agreed that Plaintiff was unarmed at the time. Both also assert, however, that Plaintiff was actively resisting arrest at the time she was tased, and the video shows

that Plaintiff was in fact holding her arms under her body for several minutes to prevent the officers from attempting to handcuff her. Plaintiff claims she did this because the officers were ignoring her pleas that she is physically unable to reach her arms behind her back. For their part, both officers assert that they told Plaintiff they would use multiple sets of cuffs to avoid harming her. Regardless, this court concludes that there is a clear dispute regarding whether any reasonable officer would believe it was necessary to deliver not one but three 50,000-volt jolts of electricity to an unarmed individual lying prone on the floor, especially considering the nonviolent nature of the crime charged (attempted obstruction of justice). When Officer Hynek kneed Plaintiff in the back and tased her the first time, she was lying on her hands to prevent handcuffing, but certainly was not in the process of fleeing the scene, and a reasonable jury could conclude that she did not pose any obvious threat. The second time Officer Hynek applied his taser, Plaintiff was on her back with her arms raised before her face in a gesture of non-threatening defensiveness. The third time, she was speaking to Officer Klingelschmidt and appeared to pose no threat, when Officer Hynek crept up behind her, applied his taser to her back, grabbed her by the neck and began roughly to force her head toward the floor, with Officer Klingelschmidt assisting. Plaintiff claims she suffered "great pain, second degree burns, skin disfigurement, and mental distress" as a result. (Pl. Compl. ¶ 13.)

The lack of sound in the video also makes it difficult to determine whether Plaintiff was actively resisting arrest or merely pleading with the officers to stop attempting to force her arms behind her back. For the same reason, it is impossible to tell whether the officers in fact told Plaintiff that they intended to use multiple handcuffs to avoid harming her, whether they warned her that resistance would result in the use of a taser to force compliance, or whether Plaintiff threatened them at any point. The record, as developed, allows for all of these possible interpretations, and consequently, the court cannot conclude as a matter of law that a reasonable officer would have believed Officer Hynek or Officer Klingelschmidt used reasonable force under the circumstances. *See Sallenger v. Oaks*, 473 F.3d 731, 742 (7th Cir. 2007) ("[S]ince the *Graham* reasonableness

inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." (quoting *Abdullani v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (internal quotations omitted)); *C.O. ex rel. O'Banion*, 2009 WL 238620, at *6.

The court notes that Officer Klingelschmidt's role in the arrest was primarily passive with the exception of her occasional attempts to hold Plaintiff still for handcuffing. This does not automatically absolve Officer Klingelschmidt of liability, however. Assuming a reasonable jury could find that Officer Hynek's conduct violated Plaintiff's Fourth Amendment Rights, it could also conclude that Officer Klingelschmidt failed to intervene to prevent Officer Hynek's use of excessive force. A "failure to intervene" claim under § 1983 requires the plaintiff to show that defendant had reason to know: "(1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Lanigan v. Village of East Hazel Crest,* 110 F.3d 467, 479 (7th Cir. 1997) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.1994)); *see also Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008). Officer Klingelschmidt was present throughout, and although she did not tase, kick, or strike Plaintiff, a reasonable jury could find that she had the opportunity to prevent harm to Plaintiff and chose to do nothing.

   **B.**  **Liability of Officers Hasse, Heintz, Tatgenhorst, and Yonkers**

Defendants presume that Plaintiff intended to allege "failure to intervene" claims against Officers Tatgenhorst, Hasse, Heintz, and Yonkers. They assert, in response, that there is no evidence that these Defendants participated in the alleged unconstitutional conduct. The substance of Plaintiff's claims, however, is not nearly so clear to the court. In her Third Amended Complaint and in her Response to Defendant's Motion for Summary Judgment, Plaintiff alleges that *all*

Defendant Officers used excessive force in attempting to force her arms behind her back despite repeated pleas that she could not be handcuffed in that manner due to her size. Plaintiff also touches briefly in her Response on the standard for a "failure to intervene" claim and suggests that a reasonable jury could find that all Defendant Officers had the opportunity to prevent harm to Plaintiff and failed to do so. *See Lanigan*, 110 F.3d at 479. (Pl. Resp. at 5-6.) All Defendant Officers, Plaintiff argues, were aware of Plaintiff's size and all "witnessed multiple painful attempts at an [*sic*] physically impossible task (handcuffing Plaintiff behind her back and being tased)."

Viewing the evidence (the video and deposition testimony) in the light most favorable to Plaintiff, this court cannot conclude that any of the four officers who arrived after Officer Hynek tased Plaintiff either acted unreasonably or had the opportunity to prevent harm to Plaintiff. None of these officers was present when Officer Hynek tased or struck Plaintiff, and after Officer Tatgenhorst arrived at Mancino's, no one tased, struck, or otherwise harmed Plaintiff with the exception of Officer Heintz, who admitted to striking Plaintiff's forearm only to force her hands apart so the other officers could cuff them at her sides. Regarding Officer Heintz's conduct, Plaintiff herself admits that her arrest was valid and that she resisted being handcuffed during the attempted arrest. Further, she does not allege and has produced no evidence that she suffered any harm from Officer Heintz's single blow to her forearm. There is likewise no evidence that any of the four later-arriving officers either participated in or had the opportunity to prevent Officer Hynek's use of a taser or any other physical abuse Plaintiff allegedly suffered while lying and sitting on the restaurant floor. Indeed, Officer Tatgenhorst's first actions upon arrival were to order Officer Hynek away from Plaintiff and to try to help Plaintiff to her feet. The court therefore concludes as a matter of law that, considering the totality of the circumstances, the actions of Officers Hasse, Heintz, Tatgenhorst, and Yonkers were objectively reasonable. *See Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985). These four Defendant Officers are entitled to qualified immunity as a matter of law, and the court grants summary judgment in their favor.

**The Village of Lansing Is Not Liable Under *Monell***

Plaintiff claims that the Village, as the Defendant Officers' employer, should be held liable for the alleged harm to Plaintiff. To hold a municipality liable under § 1983, Plaintiff must demonstrate that the alleged constitutional injury suffered was a direct result of the municipality's official policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978); *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). Plaintiff may show the existence of an official policy or custom in any one of three ways: "(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a 'wide-spread practice' that although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with 'final policy-making authority.'" *Calhoun*, 408 F.3d at 379, quoting *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). In her Third Amended Complaint, Plaintiff identifies the Village's authorization of taser usage on arrestees as an unwritten yet widespread practice "so permanent and well settled as to constitute a custom or policy of the Village" sufficient to have the force of law. (3d Am. Compl. ¶ 45; Pl. Resp. at 3.)

Since filing that Complaint, Plaintiff has failed to adduce any evidence that a Village of Lansing policy permitting the use of tasers by its police officers caused the constitutional injury alleged. Plaintiff relies entirely on this court's April 21, 2008 ruling denying in part Defendant's Motion to Dismiss, in which the court presumed that taser use was a matter of official policy for limited purpose of deciding that motion. *See* Order of April 21, 2008 [Dkt. 50]. (Pl. Mem. at 3.) Plaintiff's unsupported factual claims may have been sufficient to withstand dismissal at the pleading stage, but the higher summary judgment standard requires more than unsubstantiated, conclusory allegations. *See Lanigan*, 110 F.3d at 479 ("'[b]oilerplate allegations of a municipal policy, entirely lacking in any factual support that a city policy does exist, are insufficient.'" (quoting *Sivard v. Pulaski County*, 17 F.3d 185, 188 (7th Cir. 1994)). To survive summary judgment, Plaintiff

must show, at a minimum, that the alleged practice was widespread and that its implementation directly caused the alleged constitutional deprivation. Even assuming the alleged policy is department-wide, there is nothing *per se* unconstitutional about the use of a taser to subdue a suspect resisting arrest. Plaintiff has pointed to nothing in the record indicating that the policy alleged here—the authorized use of tasers on arrestees—routinely resulted in the unconstitutional implementation of excessive force in effecting a valid arrest. The court therefore grants summary judgment in favor of the Village of Lansing.

## **CONCLUSION**

For the foregoing reasons, the court grants Defendants' Motion for Summary Judgment [72] with respect to Plaintiff's claims against the Village of East Lansing and Officers Hasse, Heintz, Tatgenhorst, and Yonkers, and denies summary judgment with respect to Plaintiff's claims against Officers Hynek and Klingelschmidt.

ENTER:

Dated: August 26, 2009

REBECCA R. PALLMEYER
United States District Judge